# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| NANCY REILLY, | |
| Plaintiff, | Case No. 2:04-CV-00784-KJD-LRL |
| v. | **ORDER** |
| THE STATE OF NEVADA, *et al*., | |
| Defendants. | |

Presently before the Court is Defendants' Motion for Summary Judgment (#30). Plaintiff filed a response in opposition (#33) to which Defendants replied (#35).

I.  FACTS

Plaintiff Nancy Reilly ("Reilly") is a Jewish female. She began employment with the Nevada Department of Corrections in 1988 in the medical records department. Sometime in 1993 or 1994, Director Bob Bayer told Reilly that he would never promote a female. Eventually she was promoted to the rank of lieutenant in 1994. She did not have prior correctional officer experience, but was POST-certified. Reilly was originally assigned to the Jean Conservation Camp and worked there from 1994-96. From 1996 through October 2000, Reilly worked at the Southern Nevada Correctional Center ("SNCC"). From October 2000 until January 2001, Reilly worked again at the

Jean Conservation Camp. In January 2001, Reilly was transferred to High Desert State Prison ("HDSP").

In February 1995, Reilly was again told by Bayer that he would never "promote a female to a man's yard." In March of 1995, Reilly filed an EEOC complaint, because Warden Hardison told inmates that they did not have to listen to Reilly, because she was "a dirty Jew." Hardison was terminated after Reilly filed her EEOC complaint. Sometime in 1996 or 1997, a Lieutenant Daniels phoned the prison to report a missing van and told the officer who answered the phone that he would not speak to a woman. That officer filed a grievance that was responded to by Associate Warden True.

In 2001, Defendant Jackie Crawford, Plaintiff's supervisor at Jean Conservation Camp, gave Plaintiff orders that she believed to be illegal. Plaintiff refused to obey them and lectured Crawford. In response, Crawford removed Reilly's authority and job responsibilities. Plaintiff then requested and received a transfer to HDSP. When Reilly started work at HDSP, her supervisor, Warden Grigas, told her that he did not know what she was doing there and that she should just hang out in the yard.

Sometime soon after, an incident occurred where shots were fired and Reilly was the first supervisor on the scene. Warden Grigas arrived and told her to leave, assigning a male lieutenant with less experience to take over. In another incident, Grigas assigned a male officer lower in rank than Reilly to supervise a film crew on site. Later, Grigas told her to leave the scene of an inmate suicide. Subsequently, an associate warden informed Reilly that Grigas did not want to see her in the front offices where the only computer available to type reports on was located. She was told to hand write her reports. Finally, Grigas ordered Plaintiff to not carry pepper spray even though she was certified to do so.

In December 2001, Reilly tested for an associate warden's position. Reilly did not know that the position required American Correctional Association ("ACA") certification. That requirement

excluded many Department of Corrections' employees, including Reilly, for consideration for the position. She did not find out until later that ACA certification was required.

In September 2002, Reilly began working under the supervision of Defendant Charles McBurney, the Associate Warden. At this time, Defendant James Schomig was the Warden and Defendant Jackie Crawford was the Director of Prisons. Reilly was the top lieutenant at HDSP. Shortly after becoming her supervisor, McBurney put her on the "second shift" from 1:00 to 9:00 P.M. as the shift commander. He then chose a lieutenant with less seniority to work directly under him on the day shift. The second shift was considered less desirable because it allowed less overtime. Over the next two months, Reilly had a hard time keeping her shift fully staffed. The second shift was often understaffed by approximately sixteen corrections officers.

McBurney called Plaintiff nightly to criticize her performance on tasks performed during the day. She was reprimanded for counting dental tools, an important responsibility of officers working the infirmary. She was also reprimanded and forbidden from responding to "red phones," a procedure and protocol of the Nevada prison system requiring each employee to be accounted for each time an alarm came through a red phone which warned of possible hostage situations. Plaintiff believed that she could hear Defendant Schomig standing in the background telling McBurney what to say.

After an incident involving shots fired, McBurney told Reilly not to handle any more incidents but to wait for Lieutenant Miller, a male, lower ranked officer, to arrive. On another occasion Reilly approached McBurney with a supply issue, but McBurney refused to deal with the situation at that time. The next morning a male sergeant approached McBurney and resolved the issue.

Finally, on October 3, 2002, a dentist employed by HDSP called Reilly back into her office. As Reilly proceeded to the office, she was followed by an inmate. The dentist informed Reilly that she and McBurney were doing security checks. The dentist told the inmate to show Reilly what he had. The inmate displayed a scalpel taken from one of his socks. Reilly confiscated the scalpel. The

3

dentist informed Reilly that the inmate was not to be disciplined because McBurney had authorized it.

Reilly then went to McBurney's office. He informed Reilly that it was part of a systems check on her shift. When Reilly informed McBurney that "offering an inmate even a facsimile of a weapon in this state was a felony," Mcburney replied by stating that the scalpel was "only plastic." Reilly then put the scalpel on his desk. McBurney told Reilly to leave and that he would handle it.

Sergeant Covelli, a member of the State of Nevada Employees Association, made a complaint of the incident ("the scalpel incident") to the Governor's office on Plaintiff's behalf. Schomig, who was out of town, then called Reilly and accused her of fabricating the incident in order to discredit McBurney and get his job. The following Monday, McBurney issued a memo directing Reilly not to make any decisions without consulting Lieutenant Miller, a male correctional officer of lower rank. Reilly claims that she was informed by other corrections' employees that two days later Schomig called a meeting of Reilly's staff members and led them to believe that Reilly was not telling the truth about the incident and that it had not really happened. Schomig then issued a memo informing Reilly, who had not returned to work, that her shift would be run by Sergeant Powe, one of her subordinates. Approximately two weeks later the dentist resigned in lieu of termination.

Reilly sought administrative leave until she felt safe enough to return to work, but the request was denied by Glenn Whorton, Assistant Director of the Nevada Department of Corrections. She also filed a grievance with Whorton, but decided to retire when it was denied. Reilly contends that Crawford continued to investigate her after she retired. Reilly also claims Crawford denied a potential agreement reached through mediation that allowed her to return to work for the Department of Corrections.

On June 10, 2004, Reilly filed the present complaint alleging violations of Title VII, violations of her civil rights, including retaliation for her 1994 EEOC complaint, defamation, and infliction of emotional distress. On May 12, 2006, Defendants filed the present motion for summary judgment. The pleadings of both parties, particularly Plaintiff's, are disjointed, conflate different

theories of liability arising under Title VII, add new theories arising under state law, address arguments that were not raised by opposing counsel, make factual assertions with no citations to evidentiary exhibits, and seriously misstate case law.  In this case, Plaintiff's counsel has treated the Court "like [a pig], hunting for truffles buried in briefs."  See Smith v. Marsh, 194 F.3d 1045, 1052 n.5 (9th Cir. 1999)(quoting U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).  Plaintiff's skeletal arguments that combine various theories of liability under Title VII seem designed to obfuscate the evidence, create shifting targets, and hopefully preserve issues for appeal.

II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e).

All justifiable inferences must be viewed in the light must favorable to the nonmoving party.  See Matsushita, 475 U.S. at 587.  However, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant.  See Lujan v. Nat'l Wildlife Fed'n., 497 U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).  Evidence must be concrete and cannot rely on "mere

speculation, conjecture, or fantasy. <u>O.S.C. Corp. v. Apple Computer, Inc.</u>, 792 F.2d 1464, 1467 (9th Cir. 1986). "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. <u>Villiarimo v. Aloha Island Air Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002).

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Summary judgment shall not be granted if a reasonable jury could return a verdict for the nonmoving party. See <u>Anderson</u>, 477 U.S. at 248.

III.  ANALYSIS

A.  Eleventh Amendment Immunity

Plaintiff brought claims against the State of Nevada, Jackie Crawford, the Director of the Nevada Department of Corrections, in both her individual and official capacities, and McBurney and Schomig in both their individual and official capacities. Defendants have moved to dismiss most claims based on the Eleventh Amendment bar on actions against a state for damages or injunctive relief. Additionally, Defendants seek to bar suit brought against them in their official capacities under 42 U.S.C. § 1983. Defendants concede that Congress has abrogated Eleventh Amendment immunity with respect to Title VII claims. See <u>Cerrato v. San Francisco Cmty. Coll. Dist.</u>, 26 F.3d 968, 976 (9th Cir. 1994).

The Eleventh Amendment to the United States Constitution states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the Eleventh Amendment does not explicitly prohibit an action against a state or its instrumentalities by one of its citizens, the Supreme Court has construed the amendment as barring such suits. See <u>Premo v. Martin</u>, 119 F.3d 764, 768 (9th Cir. 1997) (citing <u>Hans v. Louisiana</u>, 134 U.S. 1, 10 (1890)). There are two well-recognized exceptions to Eleventh Amendment immunity: Congress can specifically abrogate it, or a state can waive it by consenting to

1  suit in federal court.  See id.  Eleventh Amendment immunity cannot be impliedly waived.  See Coll.
2  Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 682 (1999).  Rather, the
3  state must clearly declare its waiver.  See id. at 675-76.
4      Here, there is no question that the State of Nevada and the Nevada Department of Corrections
5  are either the state or instrumentalities of such.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.
6  1989).  Thus, the Eleventh Amendment bars Plaintiff's claims against them unless one of the
7  exceptions applies.  Neither one does.  The courts have held that Congress did not abrogate the
8  states' Eleventh Amendment immunity when passing the statutes now known as 42 U.S.C. §§ 1983,
9  1985, 1986.  See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984);
10 Cerrato, 26 F.3d at 975.  Additionally, Plaintiff produces no evidence that the State of Nevada has
11 clearly waived its immunity.  The Court is unaware of any Nevada statute allowing an individual to
12 file suit in federal court alleging the claims Plaintiff brings against the State of Nevada.  In fact,
13 Nevada has clearly expressed its intention to not waive immunity conferred by the Eleventh
14 Amendment.  See Nev. Rev. Stat. § 41.031(3).
15     Additionally, Plaintiff's § 1983 claims against the State of Nevada, the Nevada Department
16 of Corrections, and the other Defendants in their official capacities fail.  To state a claim under §
17 1983, a plaintiff must allege the violation of his constitutional or civil rights "by a person acting
18 under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  The Supreme Court has found
19 that neither states nor their agencies are "persons" for § 1983 purposes.  See Will v. Michigan Dept.
20 Of State Police, 491 U.S. 58, 71 (1989).  Accordingly, Plaintiff's claims against State of Nevada and
21 the Nevada Department of Corrections are not cognizable under § 1983.  A suit against a government
22 official in his official capacity is equivalent to a suit against the government entity itself.  See Larez
23 v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).  By suing Crawford, Schomig, and
24 McBurney in their official capacities, Plaintiff is essentially suing the State of Nevada.  As discussed
25 previously, the Eleventh Amendment bars Plaintiff's claims against the state.
26

B.  First Amendment, 42 U.S.C. § 1983 Claim

Plaintiff alleges that McBurney's and Schomig's actions towards her in September and October 2002 were in retaliation for her EEOC complaint in 1994.  In order to state a claim under 42 U.S.C. § 1983 for violation of the First Amendment, Plaintiff must demonstrate that (1) her speech was protected; (2) the employer took an adverse employment action against her; and (3) that her speech was a "substantial or motivating" factor for the adverse employment action.  See Cosaltzer v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003).  Thus, Plaintiff alleges that her 1994 EEOC complaint is protected speech, that McBurney and Schomig created such a hostile work environment that she was constructively discharged, and that her 1994 EEOC complaint was the substantial or motivating factor behind their conduct.  However, the Court must dismiss this claim because Plaintiff has adduced no evidence that McBurney's or Schomig's actions taken seven years after complaint and at least six years before they began working for the Department of Corrections was the substantial or motivating factor for their alleged conduct.  Therefore, the Court grants Defendants' motion for summary judgment on Plaintiff's First Amendment, § 1983 claim.

C.  Defamation Claim

Plaintiff also raises a state law claim for defamation against Defendant Schomig based upon his alleged comments to Department of Corrections' employees during meetings that followed up the scalpel incident.  In order to maintain a claim for defamation against Schomig, Plaintiff must demonstrate: (1) a false and defamatory statement of fact by Schomig concerning Plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.  See Simpson v. Mars, Inc., 929 P.2d 966, 967 (Nev. 1997).  Here, Plaintiff cannot demonstrate by admissible evidence as is required in opposing a motion for summary judgment that Schomig made a false and defamatory statement.  Instead, she testified in her deposition that other people told her that Schomig made unspecified statements that led people to believe that she was not telling the truth.  This vague, undocumented, uncorroborated hearsay statement is not admissible.  See Fed. R. Ev. 802, 801(c).  Furthermore, Plaintiff's deposition

testimony is not admissible as a statement which is not hearsay under Federal Rule of Evidence 801(d)(2), admission by party-opponent, because the statement offered is not Schomig's statement, but the statements of other unidentified declarants regarding what they thought Schomig led them to believe. Therefore, since Plaintiff has not met her burden in opposing Defendant Schomig's motion for summary judgment on this issue with specific, admissible evidence demonstrating false and defamatory statements, the Court must dismiss Plaintiff's claim for defamation.

### D. Plaintiff's Title VII Claims

Plaintiff's opposition to Defendants' motion for summary judgment makes it very difficult to determine what causes of action Plaintiff intends to assert under Title VII. Plaintiff's brief conflates the legal standards for liability under Title VII, alternately switching from a theory of a hostile work environment to disparate treatment to constructive discharge with no clear response to Defendant's motion. However, the Court has gleaned the three following violations from Plaintiff's brief: (1) Plaintiff alleges a hostile work environment based upon her religion, Jewish; (2) Plaintiff alleges a hostile work environment based upon her gender culminating in the scalpel incident which led to her constructive discharge; and (3) Plaintiff alleges a disparate treatment claim based upon her failure to be hired for the associate warden position.

#### 1. Hostile Work Environment Based on Religion

Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a)(1). To prevail on a hostile work environment claim premised on religion under Title VII, a plaintiff must show: (1) that she was subject to verbal or physical conduct of a harassing nature that was based on her religion; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive as to alter the conditions of the plaintiff's employment and create an abusive work environment. See Kang v. U. Lim America, Inc., 296 F.3d 810, 817 (9th Cir. 2002). Defendants have moved to dismiss Plaintiff's claim of religious discrimination based on a hostile work environment. Defendants allege that the

environment suffered by Plaintiff was not sufficiently severe or pervasive enough to alter the conditions of the plaintiff's employment or create an abusive working environment.

Looking at the facts in a light most favorable to the non-movant, Plaintiff, the Court agrees. The Supreme Court has suggested that the following factors be used to determine whether an environment is hostile or abusive: 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether the conduct is physically threatening, humiliating, or merely an offensive utterance; and 4) whether it unreasonably interferes with an employee's work performance. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Here Plaintiff has failed to establish any specific conduct following the 1994 incident that would create an environment that is sufficiently severe or pervasive enough to create an abusive working environment.

Plaintiff cites incidents that happened in 1992 and 1995 that are too remote in time to be actionable. In 2001, Plaintiff complains that Warden Grigas made jokes or comments about Jews. However, she fails to cite how these comments altered the conditions of her employment or created an abusive working environment. Because Plaintiff has failed to establish by admissible evidence frequent or severe discriminatory conduct based on her religion and failed to show how it unreasonably interfered with her workplace performance, the Court grants Defendant's motion for summary judgment on this claim.

2. Disparate Treatment based on Gender

Plaintiff argues that she was discriminated against by Defendant Crawford when she was passed over for promotion to associate warden, when Crawford failed to reinstate her, and when Crawford continued to investigate her after her termination. To state a prima facie case of disparate treatment, a plaintiff must show that (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably. See Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1109 n. 7 (9th Cir. 1991); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once the plaintiff establishes a

1  prima facie case, the burden then shifts to the defendant to articulate nondiscriminatory reasons for
2  the allegedly discriminatory conduct.  See Sischo-Nownejad, 934 F.2d at 1109.   The employer's
3  articulation of a facially nondiscriminatory reason shifts the burden back to the plaintiff to show that
4  the employer's reason was a pretext for discrimination.  Id.

5        Assuming Plaintiff stated a prima facie case of discrimination for being passed over
6  for promotion to associate warden, Defendants meet their burden of articulating a nondiscriminatory
7  reason for her failure to be promoted.  It is undisputed that Plaintiff was not ACA certified as
8  required for the associate warden position.  In order to demonstrate pretext, Plaintiff submits the
9  affidavit of a former co-worker who claims that the ACA certification requirement eliminated
10  virtually every candidate from within the Nevada prison system.  However, that does not demonstrate
11  pretext to cover up actual gender discrimination, because male employees were excluded by the ACA
12  certification requirement as well as female employees.  Since Plaintiff has failed to establish that
13  Defendants' legitimate non-discriminatory reason for failing to promote Plaintiff was a pretext for
14  actual discrimination, the Court must dismiss this claim.

15        Furthermore, the other incidents that Plaintiff claims demonstrate Crawford's
16  disparate treatment of her also fail to demonstrate a prima facie case.  First, the claim that Crawford
17  investigated her after she retired fails to state a claim because Plaintiff was no longer employed by
18  Defendants and the investigation is not an adverse employment action.  Second, Plaintiff has not
19  adduced any evidence that similarly situated male employees were reinstated after retiring.
20  Therefore, Plaintiff has failed to state a prima facie case on these issues and any claim arising from
21  them must be dismissed.

22        3.  Hostile Work Environment based on Gender–Constructive Discharge
23        Plaintiff claims that she was subjected to a hostile work environment culminating in
24  her constructive discharge.  Defendants have moved to dismiss this claim alleging that first,
25  constructive discharge is not a tangible employment action, and second, that Plaintiff cannot show
26

severe or pervasive conduct that altered the conditions of Plaintiff's employment or created an abusive working environment.

The Supreme Court has held that to state a hostile-environment constructive discharge claim, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign.  See Penn. State Police v. Suders, 542 U.S. 129, 147 (2004).  Thus, Plaintiff must show that (1) she belonged to a protected class; (2) the conduct was unwelcome, (3) and the conduct was sufficiently severe or pervasive as to alter the conditions of the plaintiff's employment and create an abusive work environment; and (4) the working conditions were so intolerable that a reasonable person would have felt compelled to resign.[1]  See id., Kang, 296 F.3d at 817.  In this case, Plaintiff has appropriately asserted a prima facie of a hostile-environment constructive discharge claim, complicated only by the fact that Plaintiff alleges mostly facially neutral conduct.  Resolving issues of credibility and determining whether facially neutral conduct was motivated by Defendants' discriminatory animus are questions of fact to be resolved by a jury.  See O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999).  The Court finds that genuine issues of material fact exist preventing summary judgment on Plaintiff's claims.

Defendants also seek to assert the Ellerth/Faragher affirmative defense which contains "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer."  Burlington Indus., Inc v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  However, in Suders, the Supreme Court found that where an assertion of constructive discharge involves an official action, employers are precluded from asserting the affirmative defense.  See Suders, 542 U.S. at 148-49 (citing Robinson v. Sappington, 351 F.3d 317 (7th Cir. 2003)).

---

[1] "Unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."  Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997).

12

1  Here, Plaintiff has asserted three precipitating official actions that preclude Defendants from
2  asserting the Ellerth/Faragher affirmative defense.  First, the scalpel incident.  Second, that after the
3  scalpel incident Plaintiff was required by her supervisor to consult a lower ranking male officer
4  before making decisions.  Third, that after the scalpel incident her shift was run by a male sergeant
5  on her supervisor's orders.  Therefore, the Court denies Defendant's motion for summary judgment
6  on Plaintiff's Title VII claim for hostile-environment constructive discharge.  Genuine issues of
7  material fact prevent the Court from granting summary judgment on these issues.

E.  Infliction of Emotional Distress

Given the alleged facts of this case, the Court finds that Plaintiff's claim for infliction of
emotional distress requires questions of fact to be resolved by a jury.  See Steiner v. Showboat
Operating Co., 25 F.3d 1459, 1466-67 (9th Cir. 1994)(whether conduct in Title VII hostile
environment case was extreme or outrageous requires a jury determination of fact).  The Court denies
Defendants' motion for summary judgment on this issue.

V.  Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment
(#30) is **GRANTED in part and DENIED in part**;

IT IS FURTHER ORDERED that Plaintiff's non-Title VII claims against the State of Nevada
and the Nevada Department of Corrections are **DISMISSED**;

IT IS FURTHER ORDERED that the claims against Defendants Crawford, Schomig and
McBurney in their official capacity are **DISMISSED**;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiff's
First Amendment claim is **GRANTED**;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiff's
Defamation claim is **GRANTED**;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiff's
Title VII Claim for Hostile Work Environment based on Religion is **GRANTED**;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiff's Title VII Disparate Treatment claim is **GRANTED**;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiff's Title VII Claim for Hostile Work Environment-Constructive Discharge is **DENIED**;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiff's Intentional Infliction of Emotional Distress Claim is **DENIED**.

DATED this 30th day of March 2007.

_____
Kent J. Dawson
United States District Judge